UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIQUE M.,[1]

       Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

Case No.  2:24-CV-12706
District Judge Susan K. DeClercq
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 9, 11)[2]

I.      Introduction

This is a social security case.  Plaintiff Dominique M. brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Supplemental Security Income (SSI) under the Social Security Act (the Act).  Both

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

[2] Upon review of the motions, the undersigned deems this matter appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(1).

1

parties have filed motions for summary judgment (ECF Nos. 9, 11), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). (ECF No. 7). Plaintiff has also filed a reply. (ECF No. 12).

For the reasons discussed below, the undersigned RECOMMENDS that Plaintiff's motion for summary judgment (ECF No. 9) be DENIED; the Commissioner's motion for summary judgment (ECF No. 11) be GRANTED; and the decision of the Administrative Law Judge (ALJ) be AFFIRMED.

## II.    Background

### A.    Procedural History

Plaintiff received SSI benefits as a child based on an ALJ decision dated June 20, 2013, with a disability onset date of April 30, 2012. (ECF No. 4-1, PageID.131-132). On January 24, 2017, a Continuing Disability Review (CDR) found that Plaintiff's disability had continued after she turned 18 years old. (*Id.*, PageID.181). At that time, Plaintiff was found to have the following severe medically determinable impairments: depressive, bipolar and related disorders; attention deficit/hyperactivity disorder; and obsessive-compulsive disorder. (*Id.*, PageID.35).

> These impairments were found to result in a determination indicating that the claimant had a long history of psychological adjustment issues. She was reliant upon significant assistance from her family members to complete daily activities and to complete even simple household tasks

2

and personal care.  She had limited coping abilities of her own and in matters of decision making and adjusting to changes in her environment; she will likely remain in need of assistance.  At this time, the claimant would not be able to sustain even simple repetitive tasks, on a sustained basis, in a competitive work setting.  She is not capable of independently managing her funds.[3]

(*Id.*).

However, after a second CDR a little over three years later, on March 30, 2020, Plaintiff's disability was determined to have ended as of that date and her benefits were discontinued.  (*Id.*, PageID.155).  This decision was upheld upon reconsideration by a Disability Hearing Officer.  (*Id.*).

Plaintiff then requested an administrative hearing, which was held before the ALJ on October 14, 2021.  (*Id.*, PageID.165).  On November 26, 2021, the ALJ issued a written decision finding that Plaintiff was no longer disabled as of March 30, 2020.  (*Id.*, PageID.164).  On December 8, 2022, following Plaintiff's request for review, the Appeals Council vacated the decision and remanded the case back to the ALJ.  (*Id.*, PageID.182).  On remand, the Appeals Council directed the ALJ

---

[3] This decision is the Comparison Point Decision (CPD), which the ALJ uses as the background at the next CDR to determine whether a claimant has experienced a medical improvement.  *See* ECF No. 4-1, PageID.181; *Martincic v. Comm'r of Soc. Sec.*, No. 18-11670, 2019 WL 4127217, at *6 (E.D. Mich. Aug. 9, 2019), *report and recommendation adopted*, 2019 WL 4077530 (E.D. Mich. Aug. 29, 2019) ("To determine whether the claimant's impairments have 'improved,' the ALJ uses the comparison point decision (CPD) date, which is defined as 'the most recent favorable medical decision that you were disabled or continued to be disabled,' as a reference point.").

to

> Give consideration to the treating and nontreating source opinions pursuant to the provisions of 20 CFR 416.927 and nonexamining source opinions pursuant to the provisions of 20 CFR 416.927, and explain the weight given to such opinion evidence.[4]

On April 27, 2023, a new hearing was held before the same ALJ. (ECF No. 4-1, PageID.33). On July 12, 2023, the ALJ issued a decision again finding that Plaintiff was not disabled. (*Id.*, PageID.46). On August 14, 2024, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.17). Plaintiff timely filed for judicial review of the final decision. (ECF No. 1).

### B.     Medical Evidence

On November 27, 2019, Plaintiff filled out a CDR Report in which she indicated that a typical day for her included getting up at 6:45 a.m., getting her sister ready for school and taking her to school, coming home, reading, doing chores, and picking her sister up from school. (ECF No. 4-1, PageID.508). In a function report from February 2, 2020, Plaintiff indicated that she required reminders to shower and take her medications, but she could prepare simple meals, drive a car, do chores, help care for the family dog, and go shopping when asked. (*Id.*, PageID.527-534).

---

[4] These rules apply to claims filed before March 27, 2017, and for claims filed after that date, the rules in 20 CFR 416.920c apply. *See* 20 CFR 416.927.

On January 9, 2019, psychiatrist Vencat Talasila, MD noted that Plaintiff was alert and oriented, had good hygiene and grooming, an appropriate affect, euthymic mood, no hallucinations, and no suicidal ideation. (*Id.*, PageID.686). The same was noted at appointments on March 6, 2019; November 6, 2019; January 15, 2020; although on the latter two visits her affect was noted as "appropriate to the content of thought," and during her January 2020 visit her mood was noted as "improving." (*Id.*, PageID.696, 793, 805). At an appointment on August 31, 2020, Plaintiff remained the same, with her mood noted as improving, her memory intact, and her judgment fair. (*Id.*, PageID.848). On August 3, 2021, her mood was euthymic, her thought process was logical and goal directed, and her memory was intact. (*Id.*, PageID.895).

Plaintiff routinely saw therapist Anthony Foster during 2020. (ECF No. 4-1, PageID.872-875). On July 24, 2020, Foster documented Plaintiff's diagnosis as Major Depressive Disorder and noted that she did not feel motivated and would lay around the house. (*Id.*, PageID.875). On October 24, 2020, he noted that Plaintiff had not been eating regularly or healthily and that she recently was diagnosed with high cholesterol. (*Id.*, PageID.876). He also noted that she had become "more toxic to the overall family system at home." (*Id.*). On November 6, 2020, Foster noted that Plaintiff spent most of her day in bed, and that she lacked motivation and felt high anxiety when interacting with people outside of her house, including

5

while trying to order food at the drive-thru.  (*Id.*, PageID.875).  He also noted that Plaintiff would feel overwhelmed and panicky during routine tasks at home.  (*Id.*). On December 5, 2020, Foster noted that Plaintiff had "limited motivation to leave her room" and had been having difficult days.  (*Id.*, PageID.872).  In a letter on October 14, 2021, Foster explained that Plaintiff was under his care for Major Depressive Disorder and that her Global Assessment of Functioning was 44, indicating serious impairments socially and occupationally.  (*Id.*, PageID.907).

Plaintiff had two appointments with Leonhard Maendel, PA-C in April 2021 for physical conditions, where she was noted as having an appropriate mood and affect.  (*Id.*, PageID.925, 929).  At her annual physical with Maendel on November 16, 2021, she reported that she was doing well on her medications and at home with her parents and sister and that she babysat periodically.  (*Id.*, PageID.918). On examination, she was noted as cooperative, with an appropriate mood and affect.  (*Id.*, PageID.921).  The findings were the same at her next annual on November 21, 2022, where Plaintiff again reported that she was feeling well overall.  (*Id.*, PageID.917).

### C.    Opinion Evidence

On March 12, 2020, state agency medical consultant Bruce G. Douglass, Ph.D indicated at the initial level that Plaintiff had medical improvement and her mental impairments were nonsevere.  (*Id.*, PageID.153-154).  He explained that at

her CPD, Plaintiff

> had significant emotional problems, with constricted affect, tearful presentation, problems with self-management, and mood instability. Currently, while she still carries diagnoses of Bipolar disorder and ADHD, she is functioning mostly WNL… At recent [office visits], she is alert and oriented, has good self care and euthymic mood, and denies hallucinations and [suicidal or homicidal ideations]. She presents and performs well at appointments. She appears to have stabilized and improved."

(*Id.*, PageID.153).

On April 30, 2020, Plaintiff's therapist Anthony Foster provided a Mental Residual Functional Capacity Assessment in which he indicated that Plaintiff's diagnoses were Major Depressive Disorder and Social Environment Problems. (ECF No. 4-1, PageID.796). Foster indicated that Plaintiff had either marked or extreme limitations in each category under understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.*, PageID.797-799). Foster wrote that he did not believe Plaintiff was able to work on a regular basis because the severity of her mental health diagnosis greatly limited her capabilities, and that she would need work restrictions. (*Id.*, PageID.799). He also wrote that Plaintiff was not able to manage her own funds and would need one-on-one assistance and guidance. (*Id.*).

Foster wrote again in support of Plaintiff's application on May 24, 2023. (*Id.*, PageID.957). He explained that Plaintiff was still under his care for mental health treatment with focus on her Major Depressive Disorder. (*Id.*). He said that

during the recent phase of her life, her symptoms had intensified in severity and as a result, her Global Assessment of Functioning was 41. (*Id.*). He opined that "these severe impairments have made it extremely difficult to establish [and] effectively maintain employment and difficulty in building meaningful relationships." (*Id.*).

On November 9, 2021, psychologist Michael P. Hayes, Ph.D. prepared a report after Plaintiff was seen for a psychological consultation. (*Id.*, PageID.908). Dr. Hayes noted that Plaintiff had been there a few years prior for a formal Mental Status assessment. (*Id.*). Dr. Hayes reported that Plaintiff attended the 2021 appointment with her mother and that she said she did not drive. (*Id.*). He indicated that she was casually dressed in clean clothes with appropriate grooming, and that she was cooperative but "highly anxious" and had a Squishmallow with her during the interview. (*Id.*). Plaintiff reported that she continued to experience severe anxiety symptoms, and that going out in public was difficult because she felt like she was being watched and judged by others. (*Id.*). This would result in difficulty breathing, excessive sweating, heart racing, loss of focus and control, and a sense of panic. (*Id.*). She reported that because of this, she would typically stay home and not do anything socially. (*Id.*). She also reported that she was easily overwhelmed and experienced mild to moderate anxiety at home and that she continued to experience symptoms of depression, although those were "not as bad

8

as they were." (*Id.*).

Dr. Hayes reported that Plaintiff lived at home; her mother helped administer her medications and provided food, shelter, and transportation, as well as managing her personal paperwork; Plaintiff required prompts to shower and supervision for chores; Plaintiff does not manage her own money; and she had attempted to work at McDonald's recently but it did not go well due to her anxiety. (*Id.*, PageID.909). He also noted that Plaintiff saw a therapist and psychiatrist, and that her psychotropic medications helped control her symptoms. (*Id.*). Dr. Hayes concluded that Plaintiff's "psychological profile is consistent with a diagnosis of Generalized Anxiety and Panic Disorder. Her functional abilities are also very low due to her affective issues and reduced maturity levels. This individual does not appear capable of independent function at this time." (*Id.*).

Dr. Hayes also performed a psychological evaluation on January 12, 2017, ahead of Plaintiff's prior favorable decision (or CPD). (*Id.*, PageID.670). In that report, he noted that Plaintiff was relatively cooperative, had "somewhat suspect" insight levels, and relied on her family for generalized assistance due to "reduced maturity levels." (*Id.*, PageID.672). He noted that her expressive and receptive speech patterns were normal, and that she was alert and did not appear confused or disoriented, but that her judgment skills were below average. (*Id.*, PageID.673). Her affect was flat and notably constricted and she appeared highly guarded and

withdrawn. (*Id.*). Overall, he found that Plaintiff struggled with mood instability including severe bouts of depression and anxiety and period episodes of suicidal ideation, and that she experienced panic and had difficulties with PTSD. (*Id.*, PageID.674). He also noted that there was a preexisting diagnosis of ADHD but that she took Adderall, which helped manage those symptoms. (*Id.*). He stated that her maturity levels were below chronological age expectancies, and that she received "a great deal of assistance from her family to adjust to her reduced adaptive capabilities." (*Id.*). He concluded that Plaintiff had Unspecified Bipolar Disorder, ADHD of the combined type, Generalized Anxiety, and traits of Panic Disorder and PTSD. (*Id.*). He further noted that symptoms of her disorders were in the severe ranges of impairment and contributed to significantly reduced adaptive living skills. (*Id.*).

On May 23, 2023, Plaintiff's therapist, Karolyn Wilder, APRN, PMHMP-C, completed a Mental Impairment Questionnaire. (*Id.*, PageID.949). Wilder explained that she had contact with Plaintiff every two to three weeks and that Plaintiff had diagnoses of bipolar disorder, current episode depressed; attention-deficit hyperactivity disorder, predominantly inattentive type; panic disorder, episodic paroxysmal anxiety; and mild cognitive impairment. (*Id.*). She noted that at the time she filled out the questionnaire, Plaintiff's mood was stable, and she was able to perform her daily activities, including driving her sister to school.

(*Id.*). Wilder also noted that Plaintiff experienced insomnia and occasional panic attacks, as well as frequent suicidal ideations. (*Id.*). She explained that Plaintiff's executive functioning ability was very limited, and that at home Plaintiff could complete some simple tasks as long as she was coached, but she was unable to start a task on her own. (*Id.*). Wilder noted her prognosis as "limited." (*Id.*). Wilder determined that Plaintiff had, among other things, difficulty concentrating or thinking; thoughts of death or suicide; panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; disproportionate fear or anxiety about at least two different situations; frequent distractibility, difficulty sustaining attention and organizing tasks; involuntary, time-consuming preoccupation with intrusive, unwanted thought; and distractibility. (*Id.*, PageID.950). She opined that given Plaintiff's condition, she could not hold a job that required any interaction with the general public, and that increased stress led to panic attacks and suicidal ideation. (*Id.*, PageID.954).

### D. Hearing Testimony

#### 1. October 14, 2021 Hearing

Plaintiff testified that during school she attended some special education classes and her grades were mainly Cs or Fs. (*Id.*, PageID.81). She explained that she received those grades because she was depressed and suicidal and did not have the motivation to do anything, and that some days she would have to force herself

to get out of bed, get dressed, and shower.  (*Id.*, PageID.82).  Plaintiff testified that her depression had gotten better, she had not been hospitalized in seven or eight years, she was doing better with "those negative thoughts" she used to have, and she had not done anything to hurt herself.  (*Id.*).  She also testified that she was taking medication for depression and seeing a counselor.  (*Id.*, PageID.82-83).  She explained that although her depression was better, she still had days where she felt sad or felt like she wanted to self-harm, but that she would refrain.  (*Id.*, PageID.83).

Plaintiff explained that she had to repeat 9th grade three times, and that she ultimately graduated in 2019 after switching from a large, in-person high school, where she felt people were looking at her and judging her, to an online school. (*Id.*, PageID.84).

Plaintiff testified that in addition to depression, her anxiety was "really, really high," and that being in crowded places would trigger her anxiety and she would stay glued to her mom's side.  (*Id.*, PageID.85).  She also said her anxiety would get triggered sometimes for no apparent reason, but that deadlines or being on a timer would also create anxiety.  (*Id.*, PageID.86).  She testified that her mom would have to remind her to take her medications around three times a month and that she would also remind her to do basic hygiene and her chores.  (*Id.*, PageID.89).

Plaintiff explained that she had a job at McDonald's, where she was not sure of her position but explained that she would roll burritos, do prep, clean the lobby, and stock the freezers, although the plan was to train her "how to put food down." (*Id.*, PageID.92-93).  She explained that she only got one break and would only use that one break on a daily basis.  (*Id.*, PageID.93).  She said she felt like she would get anxiety attacks at work almost every day.  (*Id.*).  During those times, she would go to the bathroom to try to calm down and then if that did not work, she would ask her manager for a little break.  (*Id.*, PageID.94).  If she was not able to calm down, she would go home.  (*Id.*).  Overall, she said that job lasted about two or three months after they had a conversation about taking her off the schedule.  (*Id.*, PageID.96).

Her manager, Calvin Gillespie, IV, testified that Plaintiff struggled with the job and had to be sent home three or four times in the two months she was there, even though she only worked on weekends.  (*Id.*, PageID.99).  Gillespie also submitted a letter explaining that Plaintiff worked at McDonald's in 2021 and that she struggled with learning and retaining information and was only capable of about 25% of what the job entailed.  (*Id.*, PageID.575).

2. April 27, 2023 Hearing (on remand)

At the April 27, 2023 hearing, the only additional testimony Plaintiff gave was that she had a Squishmallow with her and that she did not often bring stuffed

13

animals with her unless it was a place where she got really nervous or anxious. (*Id.*, PageID.59).

Plaintiff's mother, Misty Shears, testified that she had to remind Plaintiff to take her medications daily, and that she had to put Plaintiff's medications in a pill organizer every Sunday because the labels on the bottles confused Plaintiff. (*Id.*, PageID.61). Shears also testified that she had to leave Plaintiff a list of chores every day with detailed step-by-step instructions or else the chores would not get done. (*Id.*, PageID.62-63). In addition, Shears said she would send Plaintiff's younger sister, Gwen, with her on shopping trips because even though Gwen was only 16, she could help keep Plaintiff calm and she was overall more mature, which helped Shears feel comfortable with Plaintiff going out. (*Id.*, PageID.64). Shears also said that Plaintiff had been going to work with her and helping with filing, although she would need detailed instructions on how to do so each time and Shears would have to supervise her about 95 percent of the time. (*Id.*, PageID.65).

### III. Framework for Disability Determination

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

"When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where [s]he is able to perform substantial gainful activity. *Martincic v. Comm'r of Soc. Sec.*, No. 18-11670, 2019 WL 4127217, at *3 (E.D. Mich. Aug. 9, 2019) (citing 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007)), *report and recommendation adopted*, 2019 WL 4077530 (E.D. Mich. Aug. 29, 2019).  Whether an individual continues to be entitled to benefits depends on whether "there has been any medical improvement in [their] impairment(s) and, if so, whether this medical improvement is related to [their] ability to work."  20 CFR § 416.994(b).  "Improvement is measured from 'the most recent favorable decision' that the claimant was disabled," with "no presumption of continuing disability."  *Kennedy*, 247 F. App'x at 764 (citing 20 C.F.R. § 416.994(b)(1)(i)); *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284, 286–287 n.1 (6th Cir.1994)).

To determine whether a claimant's entitlement to SSI benefits has ended, the ALJ engages in a seven-step sequential analysis, which asks: at Step One, whether the claimant has an impairment or combination of impairments that meet or medically equal a listed impairment; at Step Two, whether the claimant has had any medical improvement, defined as "any decrease in medical severity of the

15

impairment(s) as established by improvement in symptoms, signs, and/or laboratory findings"; at Step Three, if there has been medical improvement, whether it is related to the claimant's ability to do work; at Step Four, whether an exception to medical improvement exists; at Step Five, whether the current impairments in combination are severe; at Step Six, the claimant's residual functional capacity based on the current impairments and whether they can perform past relevant work; and at Step Seven, whether the claimant can perform other work that exists in significant numbers in the national economy given their residual functional capacity and considering their age, education, and past work experience. *See* 20 C.F.R. § 416.994(b)(5). "[T]he ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy*, 247 F. App'x at 765.

Following this seven-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff's severe medically determinable impairments were the same as the CPD impairments— bipolar disorder, depressive disorder, learning disorder, anxiety disorder, mood disorder, attention deficit hyperactivity disorder (ADHD), and oppositional defiant disorder (ODD)—but that none of Plaintiff's impairments met or medically equaled a listed impairment. (ECF No. 4-1 PageID.35). At Step Two, the ALJ found that medical improvement occurred since March 1, 2020. (*Id.*, PageID.37).

16

At Step Three, the ALJ found that the medical improvement was related to Plaintiff's ability to work. (*Id.*, PageID.44). The ALJ does not appear to have discussed Step Four, but at Step Five concluded that Plaintiff's impairments continued to be severe. (*Id.*). At Step Six, the ALJ assessed Plaintiff's residual functional capacity (RFC) and concluded that she was capable of performing a full range of work at all exertional levels except that she

> can understand, remember, and carry out simple instructions, and make simple work-related decisions; cannot work at a production-rate pace such as on an assembly line; can tolerate occasional changes in the routine work setting; and can occasionally interact with coworkers and the general public.

(*Id.*, PageID.38). The ALJ also determined that Plaintiff had no past relevant work. (*Id.*, PageID.44). At Step Seven, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff was capable of performing the jobs of hand packer (71,000 jobs nationally), cleaner housekeeper (177,900 jobs nationally), and marking clerk (137,000 jobs nationally). (*Id.*, PageID.45). As a result, the ALJ concluded that Plaintiff's disability ended on March 1, 2020, and that she had not become disabled again since that date. (*Id.*).

## IV. Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g). Although a court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (citations omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (citations omitted).

V.     Analysis

19

Plaintiff argues that the ALJ erred by failing to properly evaluate the supportability and consistency of Foster, Wilder, and Dr. Hayes' opinions under 20 C.F.R. § 416.920c. (ECF No. 9, PageID.983). The Commissioner argues first that Plaintiff's motion uses the wrong standard, as 20 C.F.R. § 416.920c applies to applications submitted after March 27, 2017, while 20 C.F.R. § 416.927 applies to applications submitted before that date, as here. (ECF No. 11, PageID.1000). The Commissioner further argues that even if the Court accepts Plaintiff's arguments, the ALJ's analysis of each of the medical opinions was proper under the correct standard. (*Id.*, PageID.1002).

### A.     Treating Physician Rule

Plaintiff applied for benefits before March 27, 2017, meaning the ALJ was required to "give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citation modified).[5] In the presence of contradicting substantial evidence,

---

[5] In contrast, for claims made on or after March 27, 2017, the ALJ must weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources").

20

however, the ALJ may reject all or a portion of the treating source's findings, *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so, *Wilson*, 378 F.3d at 544-548 (citing 20 C.F.R. § 404.1527(d)(2)).

In declining to give less than controlling weight to the treating provider's opinion, the ALJ must consider the (1) "length of the treatment relationship," (2) "frequency of examination," (3) "nature and extent of the treatment relationship," (4) "supportability of the opinion," (5) the "consistency of the opinion with the record as a whole," and (6) "specialization of the treating source." *Wilson*, 378 F.3d at 544. "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; [he] need only provide good reasons for both [his] decision not to afford the physician's opinion controlling weight and for [his] ultimate weighing of the opinion. *Biestek*, 880 F.3d at 785 (citation modified).

### B. Application

Plaintiff argues, using the incorrect standard, that the ALJ erred in weighing the opinions of Foster, Wilder, and Dr. Hayes because all of their opinions were consistent with each other in concluding that Plaintiff had significant depression, anxiety and panic attacks, an inability to perform tasks without supervision, an inability to live independently, and a lack of motivation and participation in the outside world, each contributing to her inability to perform full time employment.

21

(ECF No. 9, PageID.986). Further, Plaintiff argues that "most importantly," these opinions were consistent with the non-medical evidence provided by Plaintiff's testimony, Gillespie, and her mother, Misty Shears. Plaintiff argues that instead of analyzing the supportability and consistency of these opinions, the ALJ noted that Plaintiff's treatment had been relatively conservative and that "some of her mental statuses were largely normal." (*Id.*, PageID.988). This, Plaintiff argues, resulted in the ALJ impermissibly discounting Plaintiff's treating opinions due to the episodic nature of her impairments. (*Id.*). She also argues that the ALJ erred in discounting Dr. Hayes' opinion because Dr. Hayes was the only medical source who provided an opinion both before and after the CPD opinion. (*Id.*, PageID.989).

The Commissioner, on the other hand, argues that the ALJ is not required to compare the opinions to each other to determine if they are consistent; rather, the ALJ must compare the opinions to the record as a whole. (ECF No. 11, PageID.1001). Further, the Commissioner points out that although Plaintiff argues the ALJ's analysis of the opinion evidence conflicted with her testimony and the testimony of her mother and Gillespie, Plaintiff does not challenge the ALJ's analysis of her subjective symptoms or the third-party evidence from her mother and Gillespie. (*Id.*, PageID.1002).

The Commissioner has the more accurate view. As a preliminary matter, the

correct standard is the treating physician rule, summarized above, under 20 C.F.R. § 416.927.  As the Appeals Council noted in its 2022 order remanding the case, 20 C.F.R. § 416.927 provides the correct standard because Plaintiff's initial application and prior CPD occurred before March 27, 2017.  (ECF No. 4-1, PageID.181).  However, Plaintiff bases her argument on the standard laid out in 20 C.F.R. § 416.920c and does not use her reply to substantially correct the error; instead, she submits only two pages arguing briefly that the ALJ also improperly applied the treating physician rule in analyzing Dr. Hayes' pre- and post-continuing disability evaluations without explaining how.  (ECF No. 12, PageID.1017).  This will be discussed further below.

Related to Plaintiff's argument that the ALJ erred because each of the opinions were consistent with each other, this is also not the proper analysis.  The ALJ is tasked with determining the consistency of each opinion with the record as a whole rather than with the other medical opinions of record.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 441-442 (6th Cir. 2010) ("[T]he rule does not instruct an ALJ to compare the consistency of treating and examining physicians' opinions to each other.  Instead, the rule instructs an ALJ to compare the consistency of a physician's opinion to the *record as a whole*."); *Hammer v. Comm'r of Soc. Sec.*, No. 13-10176, 2014 WL 1328190, at *2 n.1 (E.D. Mich. Mar. 31, 2014) ("[A]n ALJ's determination of the weight to give to the medical

opinions in the record does not consist merely of counting heads and incorporating into the claimant's RFC the limitations that appear in the majority of these opinions.  Rather, each such opinion must be evaluated on its own…").

In analyzing Foster's opinion, the ALJ explained

> I give little weight to the April 30, 2020 opinion of Anthony Foster, the claimant's therapist.  Mr. Foster indicated many marked and even extreme limitations in aspects of mental functioning.  Mr. Foster provided minimal narrative support within the opinion form for such excessive limitations.  Overall, his opinion is not consistent with the current record as a whole, as it pertains to the period at issue. The relevant evidence shows that the claimant's mental health treatment has been relatively conservative in nature.  While her objective mental statuses have fluctuated during her examinations overall, she had many statuses that were largely normal.  She has required no psychiatric hospitalization.  While the third party statements have indicated greater deficits than suggested in the objective examination findings overall, these third party statements are not entirely in line with the claimant's own allegations.  As a whole, the evidence does not show that the claimant is as mentally limited as opined by Dr. Foster.

(ECF No. 4-1, PageID.42) (record citations omitted).  In analyzing Dr. Hayes' opinion, the ALJ explained

> In a psychological consultation report dated November 9, 2021, Michael P. Hayes, Ph.D., opined that the claimant's functional abilities were very low due to affective issues and reduced maturity levels; she does not appear capable of independent function at this time.  I give little weight to this opinion.  This opinion was supported with an examination of the claimant, but it appears that this was the only time Dr. Hayes examined the claimant during the period under review.  No significant longitudinal medical records review appears to have been performed by Dr. Hayes.  Dr. Hayes referenced subjective complaints much more than any objective findings.  It seems that Dr. Hayes overly relied on the claimant's (and possibly the mother's) subjective allegations.  Overall, his opinion is not consistent with the current

record as a whole, as it pertains to the period at issue. The relevant evidence shows that the claimant's mental health treatment has been relatively conservative in nature. While her objective mental statuses have fluctuated during her examinations overall, she had many statuses that were largely normal. She has required no psychiatric hospitalization. As a whole, the evidence does not show that the claimant is as mentally limited as opined by Dr. Hayes.

(ECF No. 4-1, PageID.42-43) (record citations omitted). Finally, in analyzing

Wilder's opinion, the ALJ explained

On May 21, 2023, Karolyn Wilder, APRN, PMHNP-C, a treating professional, completed an opinion form about the claimant's functioning. Ms. Wilder noted substantial limitations in some areas of mental functioning, including some areas where the claimant was unable to meet competitive standards. She indicted (sic) many marked limitations with respect to areas of mental functioning resembling the paragraph B criteria. I give little weight to this opinion. This opinion was support (sic) with some narrative explanation, but no actual examination notes were provided that would support the opined limitations. Overall, the opinion is not consistent with the current record as a whole, as it pertains to the period at issue. The relevant evidence shows that the claimant's mental health treatment has been relatively conservative in nature. While her objective mental statuses have fluctuated during her examinations overall, she had many statuses that were largely normal. She has required no psychiatric hospitalization. As a whole, the evidence does not show that the claimant is as mentally limited as opined by Ms. Wilder.

(ECF No. 4-1, PageID.43) (record citations omitted).

In making each of these findings, the ALJ found that the opinions were not consistent with or supported by the objective medical evidence in the record. Despite Plaintiff's argument that the opinions were consistent with her testimony and the testimony of her mother and Gillespie, the ALJ did not give great weight to

25

those non-medical opinions, and therefore did not use them as support for the medical opinions of Foster, Dr. Hayes, and Wilder.  As Plaintiff does not challenge the ALJ's finding that these non-medical opinions were largely inconsistent with the record, she cannot then challenge the ALJ's decision to not use those same opinions as support for Foster, Dr. Hayes, and Wilder's medical opinions.  *See Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that Hollon appears to raise in her brief on appeal.").

Overall, the ALJ properly analyzed the opinions of Foster, Dr. Hayes, and Wilder, including by discussing the supportability and consistency of each opinion. For example, for supportability, the ALJ pointed out that Foster's findings of marked and extreme limitations in every category were not supported by any sort of narrative support or objective findings in the medical record.  Foster's notes from each of his sessions with Plaintiff largely summarized Plaintiff's report of her subjective symptoms rather than including objective mental status examination findings, and as discussed above, the ALJ found that Plaintiff's subjective symptoms were not entirely consistent with the medical record.  *See McCready v. Comm'r of Soc. Sec.*, No. 10-13893, 2012 WL 1060088, at *8 (E.D. Mich. Mar. 2, 2012), *report and recommendation adopted*, 2012 WL 1059747 (E.D. Mich. Mar. 29, 2012) (observations in "chief complaint" and "history of present illness"

26

sections "are merely the narrative description of plaintiff's subjective complaints and symptoms and are not opinions regarding plaintiff's limitations or restrictions").

For Dr. Hayes' opinion, the ALJ explained that he had only examined Plaintiff once during the relevant period and it seemed that he largely relied on Plaintiff's subjective symptoms, and potentially Shears' retelling of Plaintiff's symptoms, in coming to his conclusion, which, again, the ALJ stated were not supported by the record as a whole. *See Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012) (finding that the ALJ was justified in discounting the opinion of claimant's treating physician where the treating physician's "assessment appeared to be based on [the plaintiff's] subjective complaints, without sufficient support from objective clinical or neurological findings." (citations omitted)). Plaintiff argued that the ALJ's analysis was "obviously wrong" to conclude that "this was the only time Dr. Hayes examined the claimant during the period under review," because Dr. Hayes had provided an opinion before her prior review. (ECF No. 9, PageID.989). It is unclear the point Plaintiff attempts to make here; the ALJ was correct that Dr. Hayes had only examined her one time *during the period under review*. That he examined her prior to her most recent favorable decision does not change that point. Plaintiff's argument on this point is otherwise undeveloped and "warrants little discussion, as [she] has made little effort to

develop this argument in her brief…" *Hollon ex rel. Hollon*, 447 F.3d at 491.

Finally, for Wilder's opinion, the ALJ explained that her findings, similar to Foster's, were supported only by some narrative explanation but no treatment notes or objective findings.  Further, for each of these opinions, the ALJ also found them inconsistent with the objective medical evidence contained in the record.  A large portion of the medical record is made up by the notes of Dr. Talasila, Plaintiff's psychiatrist, and at each visit, he largely found her mental status to be within normal limits.  The same goes for the visits with Plaintiff's primary care provider when she was seen for physical ailments.

Plaintiff also argues that the ALJ improperly discounted the opinions due to the episodic nature of Plaintiff's mental impairments, relying on *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315 (6th Cir. 2015).  In *Winn,* the Sixth Circuit found that the ALJ's decision to discount the opinion of the treating physician was not supported by substantial evidence because the ALJ improperly focused on the plaintiff's improvement and "good days," ignoring that the record "continuously indicated that [the plaintiff] suffered from depression, mood swings, and anxiety." *Id.* at 324.  That is not the case here.  The ALJ decided to discount the opinions of Foster, Dr. Hayes, and Wilder based on the lack of objective medical evidence in the record supporting their decisions that Plaintiff was severely impaired, rather than a few instances where Plaintiff was experiencing a "good day."

28

Ultimately, very little objective medical evidence exists in the record, and a large part of the available medical record indicated that Plaintiff's psychological symptoms were within normal limits, as laid out above.  As the ALJ pointed out, her treatment was also conservative, and she did not require any period of psychiatric hospitalization.  The record therefore provides substantial evidence to support the ALJ's conclusion that none of the medical opinions provided were entirely persuasive.

As discussed above, Plaintiff does not challenge the ALJ's analysis of any factor other than supportability and consistency.  Even considering the other factors, the medical opinion of a claimant's treating physician is only given controlling weight as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2); *see Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-176 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." (citation omitted)).

## VI.    Conclusion

Although Plaintiff suffers from impairments which affect her daily life, the ALJ's decision, particularly his analysis of the medical opinions, and Plaintiff's

ability to work within limitations, is supported by substantial evidence.

Accordingly, for the reasons discussed above, the undersigned RECOMMENDS that Plaintiff's motion for summary judgment (ECF No. 9) be DENIED; the Commissioner's motion for summary judgment (ECF No. 11) be GRANTED; and the decision of the Administrative Law Judge (ALJ) be AFFIRMED.

Dated: February 3, 2026                    s/Kimberly G. Altman
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge

### NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 3, 2026.

s/Dru Jennings
DRU JENNINGS
Case Manager

31